UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

ARYION SANDERS,

        Plaintiff,

  v.

JOE SPLITTORFF, MICHAEL O'NEILL, and CITY OF ALTON,

        Defendants.

Case No. 17-cv-864-JPG

**MEMORANDUM AND ORDER**

This matter comes before the Court on the defendants' motion for summary judgment on the three remaining claims in this case (Doc. 80). Plaintiff Aryion Sanders has responded to the motion (Docs. 86-88).

This case arose after Sanders, a pretrial detainee at the Madison County Jail, was interrogated in August 2015 by two detectives of the Alton Police Department, defendants Joe Splittorff and Michael O'Neill. Sanders ended up giving incriminating statements. Sanders complains of the manner in which Splittorff and O'Neill interrogated him, which he believes is attributable to the defendant City of Alton ("City") because the interrogation techniques were part of an express municipal training policy or practice. Sanders began this lawsuit *pro se* in August 2017, but the case was stayed for a substantial period of time to allow the state criminal case against him to reach a conclusion. The stay was lifted in May 2022 after Sanders pled guilty in his criminal case. He is now represented by counsel in this case where three claims in the Third Amended Complaint (Doc. 65) remain:

**Count 1:**     a Fourteenth Amendment claim against Splittorff and O'Neill for conscience-shocking interrogation;

**Count 2:**     a *Monell* claim against the City for policies directing the conscience-

shocking interrogation; and

**Count 3:** an intentional infliction of emotional distress claim against Splittorff and O'Neill for the interrogation.

## I. Summary Judgment Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396. Nevertheless, the "favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017) (internal quotations and citations omitted); *accord Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022).

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial. *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). Where the nonmoving party carries the burden of proof at trial, the moving party may satisfy its burden of production in one of two ways. It may present evidence that affirmatively negates an essential element of the nonmoving party's case, *see* Fed. R. Civ. P. 56(c)(1)(A), or it may point to an absence of evidence to support an essential element of the nonmoving party's case without actually submitting any evidence, *see* Fed. R. Civ. P. 56(c)(1)(B). *Celotex*, 477 U.S. at 322-25; *Modrowski*, 712 F.3d at 1169. Where the moving party fails to meet its strict burden, a court cannot enter summary judgment for the moving party

even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 322-26; *Anderson*, 477 U.S. at 256-57; *Modrowski*, 712 F.3d at 1168. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252.

## II.     Facts

Viewing all evidence and drawing all reasonable inferences in Sanders's favor, the admissible evidence establishes the following relevant facts.

Sanders's guilty plea establishes that on August 5, 2015, he shot James Hubbard and killed him. Sanders was 17-years-old at the time and was inexperienced in police interrogations. It was not clear at the time of the shooting who the perpetrator was, but Sanders was immediately suspected of being, at a minimum, a witness. Law enforcement officers questioned Sanders twice when they thought he was a potential witness, and then twice again after he became a suspect.

In custody on other charges in the Madison County Jail, Sanders was brought to the Alton Police Department on August 13, 2015. He was *Mirandized*, which he acknowledged in writing, and then interviewed by Splittorff and O'Neill from shortly after 10 p.m. until about 2:45 a.m.

This was his third interview with law enforcement officers.  Sanders was isolated from his support system—his friends and family—during the interrogation.

Neither detective struck or physically threatened Sanders; both acted in conformity with their training.  One of the interrogation techniques taught and used was proximity to the suspect by getting into his personal space.  This technique was sometimes used by law enforcement officers to comfort and establish rapport with the subject and sometimes to make him uneasy and convey that the suspect could not escape what he had done, and sometimes alternated between the two purposes.  With Sanders, Splittorff positioned his chair close to Sanders and leaned forward toward him.  Splittorff moved progressively closer to Sanders during the interview until he was within a foot of him.  At points, Sanders was cowering in the corner between a table and a wall with his face buried in his hands.

Consistent with their training, the detectives also used the theme of Sanders's closeness with his younger brother Ahmad to extract a confession from Sanders.  They told Sanders the police were going to bring Ahmad in for questioning again.  They did this because they believed that either Sanders or Ahmad was the shooter and wanted to review discrepancies in their statements.  More importantly, they wanted to exploit Sanders's closeness with his brother to emotionally pressure Sanders to confess to protect his brother from prosecution and jail.  It was this theme of protecting his brother than had Sanders cowering in the corner.  At one point, O'Neill said he hoped Ahmad did not have a gun, raising the specter of Ahmad being shot if he showed a gun while being apprehended.  In this interview, Sanders asked for the interview to stop, but the detectives kept asking him questions.  Then Sanders confessed, after which he was taken to a holding cell at the Alton City Jail.

The next day, August 14, 2015, at a little after 3 p.m., Splittorff and O'Neill conducted a

fourth interview.  Sanders was again read his *Miranda* rights and acknowledged his understanding in writing.  Sanders confessed again to killing Hubbard and discussed various details of the shooting with the detectives.  Again, neither detective struck or physically threatened Sanders, and both performed in a manner consistent with their training.

The criminal prosecution of Sanders included two trials.  The first resulted in a hung jury.  His conviction in the second was reversal by the Illinois Appellate Court.  *See* 7/24/23 Mem. & Order 1-2 (Doc. 64), *citing People v. Sanders*, 184 N.E.3d 281 (Ill. App. Ct. 2021); Mad. County Circuit Clerk, Court Records Search, http://www.co.madison.il.us/departments/circuit_clerk/court_records-search.php (search for Case No. 2015CF1880).  The Appellate Court ruled that Sanders's confession could not be used for any purpose at trial because a coercive environment in the interrogation that overcame Sanders's will rendered the confession involuntary.  *Sanders*, 184 N.E.3d at 294-97.  Neither Splittorff nor O'Neill were reprimanded for conducting a coercive interview or provided more training as a result of the suppression of the evidence.

In April 2022, when it was clear the prosecution could not use the confession for any purpose, Sanders pled guilty to the second-degree murder of Hubbard.  He was sentenced to serve 15 years in prison.[1]

**III.    Analysis**

        A.      Count 1:  Due Process Claim Against Splittorff and O'Neill

Splittorff and O'Neill ask the Court for summary judgment for a variety of reasons, including that nothing they did during their interrogations of Sanders shocked the conscience

---

[1] To the extent Sanders suggests his confession was false and he was not guilty of the crime to which he pled, the claim would be barred by *Heck v. Humphrey*, 512 U.S. 477 (1994).  *Heck* held that a convicted criminal cannot not bring a § 1983 civil suit questioning the validity of his conviction until the conviction is overturned.  *Id.* at 486-87; *DeWalt v. Carter,* 224 F.3d 607, 614-15 (7th Cir. 2000).  Sanders's conviction has not been overturned.

such that his substantive due process rights were implicated and that, even if it had, the law was not clearly established at the time that their conduct was unconstitutional.

### 1. Due Process Rights

Sanders claims his Fourteenth Amendment substantive due process rights were violated by Splittorff's and O'Neill's interrogation of him when he was only 17-years-old. It is true that "[a] plaintiff may sue under § 1983 for police behavior that 'shocks the conscience,' including 'conscience-shocking interrogation tactics.'" *Cairel v. Alderden*, 821 F.3d 823, 833 (7th Cir. 2016) (quoting *Fox v. Hayes,* 600 F.3d 819, 841 (7th Cir. 2010)); *see Chavez v. Martinez*, 538 U.S. 760, 774 (2003) (Thomas, J.) ("Convictions based on evidence obtained by methods that are so brutal and so offensive to human dignity that they shock the conscience violate the Due Process Clause," and may also give rise to § 1983 liability. (cleaned up)); *Rochin v. California*, 342 U.S. 165, 172, 174 (1952).

What is shocking to the conscience can be difficult to determine. "[T]he ultimate question is 'whether the conduct is 'too close to the rack and the screw.'" *Cairel*, 821 F.3d at 833 (quoting *Rochin*, 342 U.S. at 172). However, mere persistent questioning is not, by itself egregious or conscience-shocking so as to trigger substantive due process concerns. *Chavez*, 538 U.S. at 774-75 (Thomas, J.). Nor is the use of ordinary interrogation tactics such as lying to, threatening in a non-violent way, insulting or making false promises to a suspect. *Fox*, 600 F.3d at 841 (citing *Tinker v. Beasley*, 429 F.3d 1324, 1329 (11th Cir. 2005)). Conduct most likely to be conscience shocking is "conduct intended to injure in some way unjustifiable by any government interest." *Cairel*, 821 F.3d at 833 (internal citations omitted).

Not surprisingly, where standards are not clearly defined, qualified immunity will often dispose of a claim of a constitutional violation. It does so here.

2. <u>Qualified Immunity</u>

Qualified immunity is an affirmative defense that shields government officials from liability for civil damages where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable officer would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000). The qualified immunity test has two prongs: (1) whether the officer violated a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *District of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018); *Pearson*, 555 U.S. at 232; *Wilson v. Layne*, 526 U.S. 603, 609 (1999). The Supreme Court encourages, but does not require, examining the second prong before diving into the merits of the plaintiff's claim where it is not necessary. *Wesby*, 583 U.S. at 62 n.7 (quoting *Camreta v. Greene*, 563 U.S. 692, 707 (2011)); *accord McGee*, 55 F.4th at 572. The Court does so here.

Under the second prong of the qualified immunity inquiry, the law at the time of the conduct "must have placed the constitutionality of the officer's conduct beyond debate" such that "every reasonable official would understand that what he is doing is unlawful." *Wesby*, 583 U.S. at 63 (internal quotations omitted). It must have been "settled law," that is, it must have been "dictated by controlling authority or a robust consensus of cases of persuasive authority." *Id.* (internal quotations omitted). Generally, this requires a high degree of specificity in the precedent so that every reasonable officer would have been alerted to the law in the particular circumstances. *Id.* And it is incumbent on the plaintiff to demonstrate the clear establishment of the law in the particular circumstances. *Denius*, 209 F.3d at 950.

a. <u>Violation of a Constitutional Right</u>

The first prong of the qualified immunity analysis is whether the evidence establishes a

7

violation of a constitutional right—here, Sanders's Fourteenth Amendment substantive due process right to be free from interrogation that shocks the conscience.[2]

The only evidence in this case describing the conduct of Splittorff and O'Neill is their own testimony and the hours of video that the parties have submitted on DVD. The detectives' testimony reveals nothing that "shocks the conscience." They describe invading Sanders's personal space to make him uncomfortable while questioning him, intimidating him in a non-violent way by making him feel he could not escape what he had done, and exploiting his close relationship with his brother Ahmad to provide incentive for Sanders to confess regardless of whether he was actually guilty. They threatened to bring Ahmad in for questioning again, but nothing suggests this was conscience-shocking where they had a legitimate reason and the authority to do so because Ahmad was a witness, if not also a suspect. Even if their intentions were not justified by the facts and the law, lying to suspects about questioning a family member is not so shocking that it implicates due process rights. And while it was underhanded to suggest Ahmad might be shot, underhandedness by law enforcement officers generally does not "shock the conscience."

As for the DVDs of interrogations themselves, the parties have not pointed to any specific time in the recordings or transcripts where the conduct they describe occurred. It is not the Court's function to "scour the record" in search of evidence to support or defeat a motion for summary judgment. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). The parties have not directed the Court to specific events in the recordings, instead

---

[2] Sanders references violations of his Fifth and Sixth Amendment rights. Such claims are no longer in this case, although his incriminating statements were excluded in his criminal case because of violations of those rights. This case now concerns only Sanders's substantive due process right to be free from conscious-shocking interrogation.

inviting the Court to spend hours upon hours watching and listening to the entirety of the interviews to try to piece together the parties' arguments for them. This is beyond the Court's role on summary judgment. Therefore, the Court would be justified in excluding the recordings from consideration.

Instead, the Court takes a middle road between watching all the recordings and not watching any. It has reviewed the plaintiff's recording in its entirety and most of the defendants' recordings at an accelerated speed, only slowing down when the parties displayed apparent signs of stress or coercion. The Court has found that the defendants used a great deal of deception to create the false impression that they were allies of Sanders and that they had concrete, irrefutable evidence of his guilt. They played on his desire to be responsible in the eyes of a fictional forgiving public who would admire him if he admitted to the crime. They leveraged Sanders's love for his brother in an underhanded, unseemly way to emotionally pressure him to confess, even if only to protect his brother. And they were overly suggestive of details of the shooting and its aftermath. These were tactics a 17-year-old boy was unlikely to be able to resist as demonstrated by his teary physical breakdown in the early hours of August 15 after more than four and a half hours of interrogation. And indeed, Sanders confessed, an admission which the Court must accept as true in light of his guilty plea. Nevertheless, the interviews concluded with the parties' being friendly with each other and Sanders's displaying no outward signs of distress.

Even though the interrogation techniques used by the defendants seem harsh for such a young suspect, the Court need not decide whether they amount to a due process violation. It seems likely that those techniques are not qualitatively different from the persistent questioning, lies, non-violent threats, insults or false promises that have been found not to violate due process. And the techniques were likely justified by the governmental interest in identifying and detaining

9

the perpetrator of a violent crime; the defendants' treatment of Sanders was not separable from a legitimate interrogation to capture a dangerous criminal. Sanders's youth may have rendered these ordinary interrogation techniques particularly harsh, but he did not complain of his treatment at the time, and left the detectives on friendly terms. These facts suggest the interrogation fell short of conscience-shocking.

However, the Court need not decide whether there was a constitutional violation because the law regarding such a potential violation was not clear at the time.

### b. Clearly Established Law

As noted above, it is difficult to determine what law enforcement officers' interrogation conduct shocks the conscience sufficiently to impinge on substantive due process rights. "Determining what constitutes such behavior can be difficult; the ultimate question is 'whether the conduct is 'too close to the rack and the screw.''" *Cairel v. Alderden*, 821 F.3d 823, 833 (7th Cir. 2016). Sanders cites no controlling authority or consensus of cases clearly dictating that the specific conduct of Splittorff or O'Neill was unconstitutional.

Sanders has pointed to no caselaw existing at the time—August 2015—that such interrogation was so shocking to the conscience that it amounted to a due process violation. The only case he cites for this purpose is *Gill v. City of Milwaukee*, 850 F.3d 335, 338 (7th Cir. 2017). *Gill* could not have clearly established any legal proposition by August 2015 because it was decided more than a year after the interrogation in question. And even if *Gill* had been decided by August 2015, it did not hold that an interrogation factually similar to the one in this case violated a suspect's substantive due process rights—even a suspect that was particularly vulnerable because of, for example, age or intellectual disability. *Id.* at 341 ("There is no precedent that places the constitutionality of the detectives' actions beyond debate." (internal

10

quotations omitted)).

Instead of pointing to a specific case or body of caselaw to defeat qualified immunity, Sanders only points to general legal concepts that officers must respect defendants' rights during interrogation. That is not enough to defeat a qualified immunity defense on summary judgment. "Whether interrogation tactics are unconstitutionally coercive is an inquiry that depends on the specific facts and circumstances present in a particular case." *Id.* Precedent or a trend in the caselaw must "put[] the unconstitutionality of the officers' conduct here 'beyond debate.'" *Id.* Highly generalized assertions of the right to be free from coercive or conscience-shocking interrogation will not defeat a qualified immunity defense in the absence of a close factual analog to the facts of the case at bar. *Id.*

Because the law was not clearly established at the time of Sanders's interrogation in August 2015 that Splittorff's and O'Neill's conduct in the interrogation was unconstitutional, they are entitled to summary judgment on Count 1 on the basis of qualified immunity.

B.     Count 2:  City of Alton

The City argues that it cannot be liable because (1) Splittorff and O'Neill are not liable and (2) there is insufficient evidence for a jury to find an unconstitutional municipal policy or practice. Sanders argues in response that the City ratified the detectives' "flagrant[] breach[ of] their own training with regard to interrogations," Pl.'s Resp. 2 (Doc. 86), by failing to sanction or further train them after the state court suppressed Sanders's confession,

The Court takes the City's second argument first because it is dispositive of Sanders's claim against the City. The Court has already set forth the municipal liability standards under *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978), several times in this litigation, but it will briefly restate them here. *Monell* set forth the circumstances where a

11

municipality can be liable in its own right under § 1983 for a constitutional violation: (a) an express municipal policy calling for a constitutional violation; (b) a widespread practice of constitutional violations that was so permanent and well settled as to constitute custom or usage with the force of law; or (c) a constitutional violation caused by a person acting with final policymaking authority for the body. *Monell*, 436 U.S. at 694; *McCormick v. City of Chi.*, 230 F.3d 319, 324 (7th Cir. 2000).

It is unclear whether Sanders relies on the first or second *Monell* theory. At times he claims the City expressly taught and condoned interrogation techniques used by Splittorff and O'Neill in interrogating Sanders. However, it is clear that the techniques—persistent questioning, lying to, threatening in a non-violent way, insulting, or making false promises to a suspect, *Fox v. Hayes,* 600 F.3d 819, 841 (7th Cir. 2010)—in and of themselves do not make an interrogation shocking to the conscience. Nor do the techniques of using proximity to befriend, intimidate, or both, or of taking advantage of a suspect's desire to protect his family, by themselves, shock the conscience. These are the techniques the detectives were expressly taught by the City, but no reasonable jury could find that simply teaching those techniques to detectives is a policy that calls for a constitutional violation.

Sanders may also be relying on the second *Monell* theory—that there was a widespread practice of abusing the expressly-taught interrogation techniques to violate suspects' constitutional rights. Indeed, he asserts in his response that the detectives flagrantly violated their own training. As a preliminary matter, as discussed in connection with Count 1 against Splittorff and O'Neill, it is far from clear that the detectives' use of the interrogation techniques they were taught was shocking to the conscience such that it violated the Constitution .

More importantly, even if it were shocking to the conscience, Sanders cites to only his

12

experience with the use (or misuse) of those techniques. To show a widespread practice of unconstitutional abuse of interrogation techniques there must be "evidence of a prior pattern of similar constitutional violations." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 234 (7th Cir. 2021); *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 617 (7th Cir. 2022) (plaintiff claiming widespread practice must point to others injured by the practice). Pointing to isolated violations is generally not enough to establish a widespread practice that is "so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Phelan v. Cook Cty.*, 463 F.3d 773, 789, 790 (7th Cir. 2006); *see Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020). A widespread practice is the pivotal requirement of such a § 1983 claim. *Id.* (citing *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) (holding four incidents over about eleven months involving only plaintiff were insufficient to show a widespread practice or custom)). And without a widespread practice, even a failure to correct or discipline the violator is not enough to show municipal ratification of the policy.

Sanders cites *Grandstaff v. City of Borger, Tex.*, 767 F.2d 161 (5th Cir. 1985), in support of his argument that a single but egregious incident may be enough to show municipal ratification of misconduct. In *Grandstaff*, numerous police officers in pursuit of a suspect shot recklessly throughout the course of the hunt and "poured their gunfire" into the truck and person of an innocent neighbor, killing him. *Id.* at 165. The victim's family sued the municipality alleging its policies of insufficient training of officers and tolerating officers' incompetence and misbehavior caused the victim's death. *Id.* at 166. A jury found the municipality liable. *Id.* The Court of Appeals for the Fifth Circuit acknowledged that to hold a municipality liable, there must be more than isolated instances to prove knowledge and acquiescence by the municipality. *Id.* at 171. The plaintiffs in that case had not done so. *Id.*

However, the Court of Appeals also acknowledged that a municipality's knowledge of and acquiescence to an unconstitutional practice can be inferred circumstantially from the conduct of the wrongdoers and the reaction of the municipal policymaker. *Id.* The Court found that repeated recklessness by numerous police officers in several episodes on the night in question—rather than a single instance of abuse—tended to prove that disregard to human life and safety was so prevalent as to be a municipal policy or custom. *Id.* Further, the municipality's failure to reprimand or discharge the reckless officers after their "incompetent and catastrophic performance" and their "gross abuse of the use of deadly weapons" gave the jury a basis to conclude that such conduct was municipal policy. *Id.* The municipality's abject failure to admit any error or change its policies further indicated ratification of this prevalent conduct. *Id.* at 166, 171.

*Grandstaff* and the case at bar are very different. Here, two detectives interviewed Sanders, albeit multiple times. But unlike in *Grandstaff*, not every officer on the shift participated multiple times in egregious abuse in the same incident. Prevalence of misconduct simply cannot be inferred from multiple violations occurring *en masse* as was the case in *Grandstaff*.

And as noted above and unlike the conduct in *Grandstaff*, it is uncertain whether Splittorff's and O'Neill's conduct violated Sanders's substantive due process rights because those rights in the context of conscience-shocking interrogation are not well-defined. The City's position that Splittorff and O'Neill did not violate Sanders's due process rights here does not suggest it knows of and tolerates prevalent conscious-shocking interrogation as municipal policy or custom. And the detectives and the City admit that they were wrong when they failed to scrupulously observe Sanders's Fifth Amendment rights when Sanders asked to stop the

14

questioning. Unlike in *Grandstaff*, the municipality did not stubbornly remain unrepentant in the face of clearly unconstitutional conduct. *Grandstaff* presents a vastly different set of facts and circumstances, so its rule does not suggest a reasonable jury could find the City liable for a policy or custom of promoting or tolerating conscience-shocking interrogations.

Because there is no evidence from which a reasonable jury could infer a widespread unconstitutional practice, no reasonable jury could find the City liable in this case. Accordingly, the Court must grant summary judgment for the City on Count 2.

C. <u>Count 3: Intentional Infliction of Emotional Distress</u>

In light of these holdings, the only remaining claim is Count 3, a state law intentional infliction of emotional distress claim against Splittorff and O'Neill. The Court continues to have jurisdiction over this state claim under 28 U.S.C. § 1367(a), which extends supplemental federal jurisdiction to all claims that are sufficiently related to the claims on which original jurisdiction is based so as to be part of the same case or controversy. However, § 1367(c)(3) provides that a district court "may decline to exercise supplemental jurisdiction . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."

A district court has broad discretion in deciding whether to decline jurisdiction over state law claims when no original jurisdiction claims remain pending. *RWJ Mgmt. Co. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 478 (7th Cir. 2012). The district court should consider judicial economy, convenience, fairness and comity. *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). "[W]hen the district court dismisses all federal claims before trial, the usual and preferred course is to remand the state claims to the state court unless there are countervailing considerations." *Payne for Hicks v. Churchich*, 161 F.3d 1030, 1043 (7th Cir. 1998) (citing *Wright*, 29 F.3d at 1251). This

15

is true even when the decision is on the eve of trial so long as the district court has not made a "substantial investment" of time in the litigating untried claims. *RWJ Mgmt.*, 672 F.3d at 478.

The Court has considered the relevant factors and finds that it is appropriate not to exercise supplemental jurisdiction over Count 3 of this case and to allow Sanders to refile that claim in state court if he chooses. He will have one year in which to do so regardless of the original statute of limitations. *See* 735 ILCS 5/13-217 (if "the action is dismissed by a United States District Court for lack of jurisdiction, . . . then, whether or not the time limitation for bringing such action expires during the pendency of such action, the plaintiff . . . may commence a new action within one year or within the remaining period of limitation, whichever is greater. . . .).

The presumption is to remand supplemental jurisdiction claims when all federal claims have been dismissed, and there are no persuasive countervailing reasons not to do so. The Court firmly believes that Illinois state courts are far better equipped to hear cases that turn on the interpretation and application of state law between citizens of Illinois. Further, Illinois state courts are in a better position to explore how the Illinois tort of intentional infliction of emotional distress relates to intentional instigation of emotional reactions during custodial interrogation. As a matter of comity and efficiency, the privilege of hearing such cases should rest with the state court system.

Additionally, it would be no less convenient for the plaintiff to proceed in state court than in federal court, and the Court sees no unfairness that would result from litigation in a state forum. Finally, the Court notes that it has not made a substantial investment of time in resolving the Count 3; the vast majority of its efforts have focused on the federal question claims. And although this case is old, it is not because the Court has invested substantial work on Count 3. It

is because of the tortured procedural history of Sanders's criminal case and the consequent need to stay this case for a substantial period. Thus, the presumption to relinquish jurisdiction has not been overcome.

For these reasons, the Court declines to exercise jurisdiction over Count 3 and will dismiss it without prejudice for lack of subject matter jurisdiction pursuant to 28 U.S.C. § 1367(c)(3).

## IV.   Conclusion

For these reasons, the Court:

- **GRANTS in part** and **DENIES in part** the defendants' motion to for summary judgment (Doc. 80).  The motion is **GRANTED** as to Counts 1 and 2 and **DENIED as moot** as to Count 3 of the Third Amended Complaint;

- **DISMISSES** Count 3 **without prejudice** pursuant to 28 U.S.C. § 1367(c)(3); and

- **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**
**DATED:  July 19, 2024**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**
